IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America | |
| | Case No. 21 CR 511 |
| v. | |
| | Judge Jorge L. Alonso |
| Gurucharan Dua | |

## Memorandum Opinion and Order

Defendant Gurucharan Dua has filed a motion for an evidentiary hearing pursuant to *Franks v. Delaware* (ECF No. 38). Dua argues that the affidavit of Food and Drug Administration ("FDA") Special Agent Jose Sanchez, on which an executed search warrant of Dua's company—Colossal Health ("Colossal")—was based, contained intentional, material omissions and misstatements. Dua therefore request a *Franks* hearing to evaluate Agent Sanchez and his affidavit. For the reasons below, the Court denies Dua's motion because Dua has not shown that Agent Sanchez's alleged omissions and misstatements in his affidavit were material to probable cause.[1]

## Background

In May 2018, Agent Sanchez prepared and submitted an application and 62-page affidavit for a search warrant of Colossal's premises, in which he described the investigation and his conclusion that probable cause existed to believe that evidence and contraband related to various criminal offenses would be found on Colossal's premises. (*See* Sanchez Affidavit, Mot. Ex. A ¶ 159.)

---

[1] Also pending is Defendant's unopposed motion to seal Exhibit R, which is a plea agreement of cooperating witness CW-1. (ECF No. 61.) The Court finds good cause exists to file Exhibit R under seal and therefore grants Defendant's motion to seal.

According to Agent Sanchez, a Special Agent with the FDA's Office of Criminal Investigations, Colossal knowingly purchased prescription drugs from unlicensed, sham companies and provided false transaction history documents (often called "pedigrees") to pharmacy customers to cover up the drugs' sources. (*Id.* ¶ 5.) In 2011, Colossal and Dua (Colossal's owner and president) began purchasing pharmaceuticals from certain "Individuals A, B, and C," who were engaged in a long-running drug-diversion scheme and who had been seeking secondary wholesalers like Colossal who could resell their diverted drugs following the suspension of another secondary wholesaler based on a criminal investigation (in which Individuals A, B, and C, and cooperating witness CW-1, also would eventually be charged). (*Id.* ¶¶ 11–15.) Those individuals registered sham businesses to disguise the source of their diverted drugs and sell those drugs to Colossal; such sham entities included Nationwide Reliable Advocates, NHDWC, JD Pharmaceutical Wholesaler, Alpine Wellness, and Covidien Sales, LLC. (*Id.* ¶¶ 20–21.) The sham companies also created fake pedigrees for their diverted drugs to falsely represent that the drugs came from a legitimate source. (*E.g. id.* ¶ 25.)

From October 2011 to November 2016, Dua, on Colossal's behalf, purchased over $57 million in diverted drugs from the sham companies. (*Id.* ¶ 21.) Dua eventually indicated that he would accept "un-clean" merchandise—meaning boxes or bottles that were damaged or had smeared, sticky, or peeling labels—from those companies. (*E.g. id.* ¶¶ 23, 53.) Colossal's standard operating procedures manual stated that if a shipment was from "Covidien" (one of the sham companies), "product will need to be cleaned. Use micro fiber cloth, facial sponge, and goo gone as necessary." (*Id.* ¶ 80.) Regardless of which sham company purported to sell particular diverted drug shipments to Colossal, and which state of origin was listed on the return-address label, shipping documents often listed the sender as "Kris Abrams" and the shipments had

2

originated from California. (*Id.* ¶¶ 30, 33, 42–46, 51–52.) Dua also appeared to have had hundreds of phone calls and text messages with the supplying drug diverters. (*Id.* ¶ 76.)

Colossal then resold the diverted drugs it obtained from the sham companies—which accounted for 77% of the drugs Colossal purchased[2]—to pharmacies across the United States, generating approximately $100 million in revenue. (*See id.* ¶¶ 81–82.) Colossal was required to have pedigrees for the drugs it sold, and its invoices to customers included the statement, "PEDIGREE FOR THIS SALE ON FILE." (*E.g. id.* ¶ 85.) Though Colossal did not send pedigrees for most shipments (as Dua points out, customers rarely asked for them), on at least one occasion a Minnesota pharmacy requested pedigrees and Colossal provided "DSCSA (Drug Supply Chain Security Act) Transaction Data Records" that traced the drugs through the sham companies and, falsely, to legitimate suppliers. (*Id.* ¶¶ 92–106; *see also id.* ¶¶ 108–09, ¶¶ 128–131 (recounting similar incidents of false pedigree records).) Dua also omitted certain sham companies from a list of suppliers he sent to a California Board of Pharmacy inspector in January 2016. (*Id.* ¶¶ 114–16.)

In one instance, a bottle of prescription drugs resold by Colossal to an Illinois pharmacy in November 2014, for which Colossal claimed to have the pedigree on file, contained the wrong medication. (*Id.* ¶¶ 117–19.) After being notified of the issue, the drug manufacturer determined that the wrong medication could not have been inserted during the bottle's packaging and labeling, and that the adhesive on the bottle was inconsistent with its own, indicating diversion. (*Id.* ¶¶ 120, 125.)

---

[2] Dua represented to at least one bank that Colossal primarily bought its drugs from "authorized (primary tier) distributors," which was not the case. (*Id.* ¶¶ 84, 135.)

In September 2016, Dua submitted an application to the National Association of Boards of Pharmacy ("NABP") on Colossal's behalf, seeking Verified-Accredited Wholesale Distributors ("VAWD") accreditation. (*Id.* ¶ 138.) Among other things, VAWD accreditation is designed to protect consumers from diverted drugs and requires various compliance measures. (*Id.*) In April 2017, NABP notified Colossal that its VAWD-accreditation application was cancelled based on non-compliance, including failing to provide complete transaction documents, maintaining affiliated businesses that are unable to comply with VAWD criteria, and submitting policies and procedures that did not comply with VAWD criteria. (*Id.*)

Under Colossal's record-retention policy, all purchasing and sales records were to be saved for five years, and Illinois law required that pedigrees be maintained for at least three years from the date of sale. (*Id.* ¶ 149.) Colossal also made transaction records available to customers on its website, and its standard operating procedures provide that product-tracing documents are maintained for at least six years. (*Id.* ¶ 150.)

In March and May 2018, Agent Sanchez surveilled Colossal's premises, where he observed various deliveries arriving at and leaving the premises and saw Dua and others at various times. (*Id.* ¶¶ 151–52.)

In May 2018, a Magistrate Judge of this Court issued the requested search warrant for Colossal's premises based on Agent Sanchez's affidavit.

## Legal Standard

The Fourth Amendment states that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "Probable cause for issuance of a search warrant exists if there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Bacon*, 991 F.3d 835, 839–40 (7th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213,

238 (1983)). If law enforcement seizes evidence without probable cause, then, absent an exception, it should be excluded, under what is known as the exclusionary rule. *Herring v. United States*, 555 U.S. 135, 139–40 (2009). Because the ability of a judge to determine probable cause depends on the accuracy of the law-enforcement officer's submissions, "a search warrant is invalid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge." *Bacon*, 991 F.3d at 841.

The Supreme Court held in *Franks v. Delaware* that a defendant may challenge the truth of statements made in an affidavit seeking a search warrant. 438 U.S. 154, 171 (1978). To obtain an evidentiary hearing on the truth of the information submitted in support of a search warrant (also known as a "*Franks* hearing"), a defendant must make a "substantial preliminary showing of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014). In addition to these requirements, the defendant must also show that, absent the false statements or omissions, probable cause would have been absent. *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018) (quoting *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013)). "[I]f probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Id*. (quoting *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)). "*Franks* hearings are 'rarely held' because '[t]hese elements are hard to prove.'" *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (quoting *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000)).

## Discussion

Dua raises several alleged misstatements and material omissions in the affidavit, which it claims were made intentionally, undermine the Magistrate Judge's probable-cause determination,

5

and warrant a *Franks* hearing and ultimately suppression. The Court concludes that Dua has not made a substantial preliminary showing that any purported misstatements or omissions were material to the probable-cause determination and thus denies Dua's motion for a *Franks* hearing.

### 1. Alleged Knowing or Reckless Omissions and Misstatements

Dua points to several items that he claims were either misstatements or important omissions in Agent Sanchez's affidavit which would have undermined his narrative that Dua knowingly purchased diverted drugs from unlicensed suppliers.

First, Dua points to Agent Sanchez's omission of information elicited during the interviews of Individuals A, B, and C. In particular, Individuals A, B, and C admitted that they lied and fabricated documents, including during an initial site visit during which Dua asked to see their license information (which Agent Sanchez did not mention in his affidavit), in order to dupe Dua into believing that they and their sham companies were legitimate and had received their drugs from legitimate suppliers. They also admitted that they were worried Dua would catch on to their scheme. Rather than relying on these interviews, Agent Sanchez's affidavit focused on information gleaned from cooperating witness CW-1, who, unlike the others, had not been in direct contact with Dua and was relaying information second-hand. Further, after agreeing to cooperate, Individuals A, B, and C resumed their criminal activity, lied to the government, and violated their bond conditions. Though Agent Sanchez's affidavit acknowledged as much regarding Individual B, he did not do so for Individual A even though in some instances CW-1 was relaying information he received from Individual A.

As Dua explains, Agent Sanchez's affidavit also made no mention of an attempted undercover controlled purchase that investigators attempted to arrange with Colossal, but which Colossal refused due to insufficient licensure from the prospective customer. Dua also claims

6

that Agent Sanchez inflated the discounts Dua and Colossal received on the drugs it purchased from the sham companies from 13% to "up to 40%," and said that the discounts were applied against an invented "going wholesale rate" rather than the actual "wholesale acquisition cost," for which Dua claims even a 40% discount is not abnormal.

Lastly, Sanchez's affidavit repeatedly noted that Colossal routinely did not provide pedigrees to its pharmacy customers, but omitted that the customers had not asked Colossal for the pedigrees either. And it failed to note that after the Illinois pharmacy had received a bottle from Colossal containing the wrong medication, it was Dua himself who told the pharmacist to contact the drug manufacturer.

Dua argues that Agent Sanchez's misstatements and omissions supported a narrative that Dua was in on the drug-diversion scheme and ignored information suggesting that Dua himself had been duped and did not know that Colossal was buying and reselling diverted drugs received from sham companies. According to Dua, these misstatements and omissions were intentional or reckless because Agent Sanchez himself participated in the relevant interviews and prepared the accompanying reports that contained the accurate information, and a prosecutor had told Sanchez in 2015 that she was not yet convinced that there was enough probable cause for a search warrant.

2. Materiality

Even assuming Dua is correct that the affidavit's various alleged misstatements and omissions were made knowingly or recklessly, he has not shown that those errors were material— that is, that correcting them would have precluded probable cause. "If probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Santiago*, 905 F.3d at 1025. Dua does not challenge the affidavit's

statements that, among other things, a substantial portion of Colossal's business involved buying diverted drugs from sham companies and selling those drugs to pharmacies, that the pedigrees and records it claimed to have on file and provided to customers were fake, and that Dua and Colossal had corresponded with the drug diverters hundreds of times. Colossal bought most of its drugs—worth over $50 million dollars—from the sham companies and then resold them to customers, and Agent Sanchez had observed packages arriving at and leaving from Colossal's premises in the weeks before he applied for the search warrant. Colossal represented that it kept the fake pedigrees associated with the sham companies on file, provided fake pedigree records to those who requested them, and would be expected to have kept those records on its premises under its own record-retention policies and appliable laws.

This is enough to reasonably infer a fair probability that contraband or evidence of a crime would be found on Colossal's premises, regardless of whether Dua himself knew or suspected that the drugs he was buying and reselling were diverted and the records were fake.[3] Dua therefore has failed to make a substantial preliminary showing of materiality and is not entitled to a *Franks* hearing. *See United States v. Roland*, 60 F.4th 1061, 1065 (7th Cir. 2023) ("Even if we take Roland at his word that [the affiant] recklessly or deliberately omitted the six highlighted facts, he did not make the preliminary showing that those omissions would alter the probable cause determination." (internal quotation marks and citation omitted)). Because the Court concludes that Dua has not

---

[3] There are reasons to infer that Dua knew what he was involved with based on the affidavit's unchallenged statements. For example, many of the packages he and Colossal received from purportedly different companies and states were from "Kris Abrams" and had originated in California, Colossal specifically instructed its employees to clean shipments received from one of the sham companies, and Dua omitted sham companies from a list of suppliers he provided to a state inspector.

made the substantial preliminary showing of materiality required to justify a *Franks* hearing, it need not resolve the parties' other arguments.

## Conclusion

The Court denies Defendant's motion for an evidentiary hearing (ECF No. 38). The Court grants Defendant's motion to file Exhibit R under seal (ECF No. 61).

**SO ORDERED.**  ENTERED: January 5, 2024

_____

**HON. JORGE ALONSO**
**United States District Judge**